May it please the Court, Matt Wolfe for Briggs & Stratton. There are two fundamental errors committed by the District Court this morning that I want to focus on. First is the unsupported summary judgment order rejecting Briggs' invalidity defenses. The second is allowing the plaintiff to apply the entire market value rule when none of the factors were attempted and proven. There are many avenues to begin the discussion of the summary judgment order. The sole cited basis for the order is the re-exam, the ex parte re-exam. Let's start there and talk about the history of the re-exam. In the re-exam, the examiners rejected the District Court's construction. So if you stop there historically, it would make no sense for the District Court to say, well, based on the re-exam, I find no reasonable jury. This is summary judgment we're talking about. No reasonable jury could find these claims invalid in light of simplicity when an examiner found, based on the District Court's construction, that very claim invalid in light of simplicity. So then what happens? We go about the claim construction wrong. It's too broad. I'm going to narrow it. Under the narrower construction, simplicity doesn't, in and of itself, anticipate. And since the examiner didn't do the obviousness analysis, it didn't know it had to because it was operating under a different claim construction, we're going to kick this ex parte re-exam. We're going to say the claims are okay. All right. Well, of course, what we stood ready to do at trial, if the District Court had changed its construction to adopt what the PTAB Appellate Board did, was argue the facts under this revised claim construction. One of two things must be true. The parties here agreed on a claim construction for float control baffle, right? And under that construction, that's right, Your Honor. Under that construction, the examiner found the claims invalid. So how could the District Court have turned around and said, based on the re-exam, I'm going to find no reasonable jury to find them invalid? Let's say for a minute that we don't think that the District Court should have just relied on the re-exam in order to justify summary judgment. We review judgments, not opinions, right? So does that mean that de novo, we look and we see whether there's a genuine issue of material facts? That's kind of teed up for us in briefs. Understood, Your Honor. And there is a line here that a District Court crosses where it's throwing its work in your lap. And as a jurisprudential or at least discretionary matter, you could say, at least tell us what limitation you found missing in the prior article. I mean, I'm here trying to prove a negative today because I don't know what limitation the District Court reportedly found wasn't in the article. Well, let me just throw a housekeeping question. Yes. Supposing we agree with you as to the summary judgment, do we need to address the damages arguments? Your Honor, I think it would be worth reminding the District Court of the rules because it so clearly did not apply the, you know, there are two reasons, two times you apply the entire market value rule. You know the two standards and it's admitted here that they didn't try to do that. We know your arguments. I'm just asking as a housekeeping matter. We would suggest that it vacate and remind the District Court of the damages standard. I don't think you need to find a specific yes or no. But if we went back just on obviousness and the jury found we were wrong on obviousness or anticipation, we think it would still be error for the courts to say, all right, well then we're going to reinstate the prior damages award. What would happen at that point? I mean, so let's say there was a trial and the patent was found to be valid. Correct. What would happen at that point with that damages award? Would there be another appeal here on damages? If the District, if your Honors believe that the District Court got it right or at least didn't abuse its discretion in allowing 5% on the entire royalty, then the District Court would be free to say I'm just reinstating. But with the admonition I'm asking from Judge Wallach to say, no, no, do this right the next time, we'd see. Hopefully we do it right. And if, you know, they argued 3% based on Georgia-Pacific and the Bright-Erickson standard and it wasn't an abuse of discretion, we wouldn't be back here. Do you think that we need to address the damages issue if we vacate and remand on several days? I do not believe you need to, Your Honor. I believe as a legal matter, as a matter of waiver, that you would not need to. We just think it would be preferable. But no, I don't believe you need to. Why is there a bias? Well, there have been footnotes where this Court has suggested how a trial might avoid coming back up here on appeal. But I'm not in a position to tell the Court how to handle those footnotes. What about the expert testimony where the expert admitted that the baffle doesn't meaningfully direct the airflow and grass cuttings at page A4510? Why isn't that sufficient for a basis for saying that there's no genuine issue? That, in and of itself, makes it so no reasonable juror could find that this patent was satisfied by simplicity. Well, two things, Your Honor. That testimony, so as a factional matter, that testimony was taken out of context. If you look, for example, at A6335, our expert, Mr. Del Ponte, who had 20 years of experience in the industry at Deere, specifically said that the flow control baffle controls flow in a meaningful way. In fact, logically, it has to because of the simplicity. So here, this is the wall, the front wall of the simplicity mower. The baffle goes lower and then out. So it actually is what's contacting the air. If anything's controlling flow, it has to be the baffle. And was this at page A6335? Is the same expert who's discussing, who made the admission at page A4510? Well, Your Honor, I'll look during the break, but I don't believe it is. Well, then, that's not an admission, then, because our expert, Mr. Del Ponte, was our expert. Oh, I apologize. It is Mr. Del Ponte at page A4510. I'll look at that as soon as I sit down. But he quite clearly said at 6335 that it does control flow in a meaningful way. He said at 6377 that it was obviously spaced apart, at 5831 that there's a motion to combine. And their own expert, Dr. Strzokowski, admitted at 11155 that it would have been obviously spaced apart. And this is when we get to the 103 analysis. We think under the district court's construction, we had a heck of a 102 case on simplicity, that we don't even need to get to the meaningful flow. And again, that's the PTAS construction, not the district court's construction. So the district court's construction doesn't require any meaningful flow. It's just spaced apart. So even some minimal amount of flow, some negligible amount of flow, would turn it into a battle. Your Honor, that's a really interesting question. Because what really the PTAS was saying, although it didn't use the language, is if you've got a wall, and this is not actually how simplicity works, but this is their understanding. If you've got a wall and put a piece of metal next to it, that piece of metal, that might be what's directing the flow, but come on, it's just mirroring the shape of what was already there. So the PTAS construction wasn't even really just that it has to have a meaningful flow. It's that there has to be a spaced apart. In other words, there has to be a meaningful effect as opposed to its absence. So it really wasn't the construction that was the basis of reversal. It was its construction of its construction. I realize that was a part of it. Or maybe it's an application of the construction. Better way. So what's wrong with that line of thinking, in terms of understanding what's really going on in simplicity? Because it's undisputed that the bolted-in baffle, and remember, you start with the mower and then you bolt in the baffle. It is undisputed that the airflow and the grass clippings are only coming into contact with and are being directed entirely by what's bolted in. Now their argument is, well, if you hadn't bolted it in, it would be affected by the outer wall, but that's not the point. I think the line of thinking that PTO had was, what if you just lined the interior front wall of the mower deck with a long sticker, so that now, as a technical matter, the air and grass clippings aren't coming in contact with a sticker and not the actual interior surface of the front wall? Nobody would really, in their right mind, think the sticker is a baffle or a control flow baffle. Your Honor, first of all, I would respond that that's not what happens here. We have a part of the claim language. The V-shaped part of the simplicity is the straight of curve-straight-curve that, in a court-like fashion, forces the air to flow. So this isn't a tricky way to avoid infringement or get an invalidity. But the second point of that is that that still would raise an obviousness question, because... I'm sorry, those pieces that stick out, the V-shaped pieces, those are part of your curve-straight-curve? Yes, so you have... I was under the impression it's really the brackets, or whatever you want to call them, that go along the interior of the front wall, that there's a curve and a straight portion, and then finally there's a curve that kind of gets you around, or a little bit around, the second cutting area. Let me respond to that directly, but first let me note that Dr. Strzokowski admitted at 11-159 and 9-445 that there's curve-straight-curve and simplicity, but with respect, if I may turn my back just so I get the orientation right, you've got this curve that is part of the baffle that also parallels the wall, and then it comes out, and that's the straight that pushes the air and the... Do you think you could actually refer to the photo? Yeah, absolutely. I think that might be helpful. I'm trying to have a board with simplicity on it that I'm planning to use, if you would like to use it... That's okay, that's okay, thanks. Yeah, I'm happy to... That's the V-shaped part that sticks out into the interior, right? So this is curved, this is straight, and that's the V-shaped part that sticks out, and that's what the core limitation, meaning that if you imagine a line of force or a line of airflow, it cuts into the circle of the next blade, so that's curved and that's straight, and the straight is not, if you took out the baffle, there wouldn't be straight there. What's the second arcuate portion, under your understanding? This is now arcuate, so to the left, it starts with the other part of the V, and then continues around to the front, and that's what Dr. Strakowski admitted. Again, this is undisputed testimony, curved, straight, curved. So you're including, that includes part of the triangular piece, which simplicity itself refers to as a baffle. That's correct, that's correct, Your Honor. So I'm already low on time, do we want to talk about it for a minute, or should we continue to focus on this? Because I would note that, just in terms of, to get in the record, there is more than ample evidence that there are bolted-in baffles, this is at 1040, I talked about the admission of curved, straight, curved. I want you to talk about the damages, the expert report. So there is no dispute that EXMARC never tried to prove that the particular baffles at issue drove demand. In fact, they never proved that baffles as a whole drove demand. Do they have to do that when the claims are directed to a lawn mower, and there's various elements in the claims, a baffle, power source, I think, a cutting blade? So Your Honor, I think this Court has a chance to make clear what has been implicit in many cases before. In Alice's case, many others, this Court has said form doesn't rise over substance when it comes to how we're going to deal with damages. And we cited four or five district court cases that have said that you don't get the value of the entire car for a new cup holder by saying a car comprising a brand new cup holder. What about our cases that say things like, you can account, you definitely need to think about, you know, just the improved feature and account for it, but why can't you do that with the, why do you have to do it with both the base and the rate? I mean, here you've got an argument that their expert didn't do it with the base or the rate. Right. But why does it have to be the base? Your Honor, that's what Erickson directly dealt with. Erickson dealing, some people call it dealing, but I call it Erickson, specifically said, look, as a mathematical matter, 1 times 5 equals 5 times 1. But we find, the Federal Circuit finds as a matter of law, that it is too likely to try to do apportionment with rate as opposed to base. That is a decided issue of law, that you have to do apportionment, and I want to make one thing clear. What's really in a standards context though? Do you think that applies to all contexts? I am not aware, I am not aware of any case that said you can permissibly, obviously you can mathematically, but as a matter of charging the jury or accepting expert testimony, I'm through the rate, not the base. And particularly here, I'm not sure this is as clear in the briefing as I would have liked, but the baffle was actually separately sold. Now, counsel argued that that sales price was not an accurate reflection of its value. Fine, we can fight that out in front of the jury, but there's no dispute here that the curve-straight curve baffle was actually separately sold. That is at 18-048, for example. And so, we don't have to get into the vernetics question of whether we're going to small a saleable unit or whether we have to parse that out. The question was, you sold this thing, what's the proper royalty? If they want to say that because they were making accommodations to customers, they artificially depressed the price, fine, that's a fact issue for the jury. But what's not a fact issue, what shouldn't have gone to the jury is, we need to know what your expert's view of the baffle is, not a percentage of the mower as a whole. Can you cite to a single Federal Circuit case where the claim was directed to something, you know, that was the same as the infringing product, and we said, nonetheless, even though the claim is directed to the product, because what you really have here, when we look at the spec, when we look at the claim, and maybe even admissions, is just an improvement of one feature, you should be limited to that feature. Remarkably, Your Honor, this court has not decided that precise issue one way or the other. A number of district courts have read your advice, your guidance, that you look at form, not substance of claim drafting, including the Alice case and others. But you're being asked for the first time, I think, to say one way or the other at this level. And with that, I think my initial time is up. I'll give you a couple of minutes. We ate your time up. Thank you. Good morning, Your Honors. May it please the court. Unless you want to direct me somewhere else, I'm going to jump right into the issues of Mr. Wolf. How about where did Ms. Bennis come up with the 5% number? I mean, I think the other side, Mr. Wolf's side, has a point to make that when you start with your base as being the ultimate end product, this big tractor mower that has a lot of different features, a lot of different things that go into making an effective one, and one of them is what's going on in the business end underneath the mower deck, we've said over and over again, if you're going to pick that as the base, you have to be hyper-vigilant that you're going to do the apportionment exercise through the rate, and we are going to scrutinize that. And here, what I saw when I read the expert report was something that was more on a qualitative level of how nice it is to have improved cut quality, and there are advantages to having improved cut quality, and then all of a sudden, abracadabra, out of a hat comes the 5% number. And so that, I'm telling you, really concerned me and worried me about the legitimacy of this verdict. Well, let's start with the Georgia-Pacific test, Georgia-Pacific factors, has been applied for decades, and is accepted as a way to come up with the value of the invention. It doesn't directly suggest that you should do that. I understand that, but let me make it clearer to you. What I saw was a qualitative discussion of the merits of the invention, and then a number picked, 5%, that if she had said 2%, or 11%, or 6.4%, there would be just as strong a connection to everything that she had said in the first 40 pages as the number 5%. And so that's where everything got very random for me. Please explain. Yeah, so her analysis ultimately wasn't the result of a mathematical calculation, a lot of the time. Clearly not. But it was based in mathematical quantitative data. And we go through a number of these in our brief, but let me hit on a couple of the high points. One, of course, is the SCAG license, the settlement of the earlier litigation involving this very same patent at 3.25%. Wasn't there more than one patent involved in the settlement? Yeah, but the agreement at 3.25% was on any patent that was used by SCAG. So that is a very specific quantitative data point that certainly 5% is higher than 3.25%, but of course in that case, validity was a real-world issue. We all know that in a hypothetical negotiation, we presume the patent is both valid and infringed. The problem with this, that I hear what you're saying, but the problem is your expert did not undertake the analysis that you're doing now. Yes, she mentioned all the Georgia-Pacific factors, but then she just said, voila, 5%. She didn't say, let's say that the lowest amount possible is 3.25 or 3.64, whatever those different licenses show. And then from there, based on different Georgia-Pacific factors, I'm going to go upward to account for this, or I'm going to go down a little bit to account for that. There's no discussion at all of how apportionment is taken into account with actual real numbers. In reviewing expert reports previously, I've seen that the experts don't just have an accounting of all the Georgia-Pacific factors and just say, here it is. Instead, there's some sort of extra analysis that goes in there, where they actually will say something like, I'm going to start with this, and then I'm going to go through all these different factors to explain how I go up a little, or go down a little, and come up with what is my ultimate suggested number. But there is nothing here. But that would suggest that that's the only way to do it, and certainly, she is an expert. It's not an only way. I mean, it's just providing a rational explanation. I'm not saying that we have to do it that way, but there's no explanation to go from, this is my view on each of these factors, to, here's 5%. But what she did say she did was she took into account all this evidence, and then she checked. I mean, at some point, she doesn't have to go through all her mental process, but, okay, 2%, 3%, 4%, 5%, is that reasonable in view of the evidence that I have looked at? She doesn't explain that. She put together roughly a 60-page report. I don't know if we put the entire thing in our appendix, but I guess I believe she did. And if I could, I'd like to point to some of the other quantitative evidence that fits very well and supports her conclusion that, again, she took into account in that process. No, no, no. Point to the quantitative evidence where she says, I relied on this to reach this. When I come back up, I can come up with the exact same pages where she said she relied on this. But let me, if I could, I've got another report that is going to be selling value documents. Wait, wait, wait. Relied on this to reach this. Both. Just so you have it in mind. Right, right. And again, we don't dispute that she didn't conduct a mathematical, you know, she didn't have a mathematical formula that spit out 5%. But keep in mind, this court has also approved of a hypothetical negotiation. And in the real world of hypothetical negotiations, people don't agree on the mathematical formula. We're not asking for a mathematical formula. I just want to make sure that's abundantly clear. No one is suggesting that a mathematical formula is required. Instead, just a discussion of how those factors, which she analyzed, support or show or relate to showing that she ended up with 5%. We're not asking for a mathematical formula. We're asking for a principled analysis. Well, again, it's been accepted law for 40 years that Georgia-Pacific is a principled analysis. It doesn't lend itself to, again, this sort of, you know, I don't want to say mathematical formula because I know you're saying that it doesn't require much. Just to be clear, what we're saying is maybe the Georgia-Pacific analysis is missing something. At least that's what I'm saying. I'm asking you. It seems to me as if it's missing something because there is an analysis of factors and then, boom, here's 5%. Missing something here. Yes. Well, let's talk about some of this quantitative stuff. I do want to put up the Southern Valley back. Let me start with that. Because, again, it fits very well. Did the report rely on this? Yes. Yes. I don't have the exact page for evidence. Someone else can get that for me while I'm up here. But this is one of those things where this is Briggs itself putting value on various features of its moles. Can you show me in the expert report, besides citing to a specific appendix page, where this is referred to? Yes. I will get to that in a moment. I don't remember seeing this in her report when I read it. We're putting this up as a visual so that you can see. She didn't put a picture of this in her report. But I will get to the page where she talked about these documents. Because this is a document that shows that what she ended up with, again, in trial, it wasn't about 5% versus $10. It was about $250 per molar versus $10. Everybody converted her 5% to an average per molar rate. When you're talking about $250 per molar, you've got all these things that are 100, 200, all the way up to 750. And then, again, we have to tie that to the other evidence at trial. We seem to have this belief that you can't have a reasonable royalty without an expert. That's not necessarily true. We did have one. Does one of these correlate with the baffle? Well, in some level, they all do. But one very closely. Briggs makes a big deal about their independent suspension. For them, that's what they consider to be an important patented feature of their molars. They priced that at $200, $250, $750, depending on the particular type. There was extensive evidence at trial that the jury was entitled to believe that said that these flow control baffles and the advantages that they provide to a molar are more important than independent suspension. The jury's entitled to believe that. And so that puts a quantitative data point on the use of $250 at a molar if Briggs itself values that feature at that level. Now go back and tell us where in the record. A1445152. A1445152. At the bottom of page 14451, the documents produced by Briggs, and it goes on to talk about added value features. Suggest values from $200 to $750. I understand from talking to Exmark, and this was before trial, but of course then this evidence came in at trial, that the importance of this invention was higher than that of independent suspension. And so she used that as part of her analysis to ultimately come to a figure that equated to $250 per molar. So this is under Georgia-Pacific Factor 11, the situation in which a figure is made use of the invention, and any evidence probative of the value of that use. The thing is, she never, in coming up with the 5%, doesn't say, this is how I relied on this information. But ultimately, a way to come to an answer is to look at all of the evidence, and test out a number and see which one fits best with all of that evidence. But that analysis of testing out the number and seeing which one fits, that seems to be the very thing that's lacking. I guess that's where I feel like, I would say she ended up at 5%, because, as she said, I can't find, I don't know if I can find the exact numbers, but ultimately that was the number. Because as a result, I believe the parties would have agreed on the royalty of 5%. I mean, after she's gone through all these factors, she's discussed all the quantitative data, she's discussed things like profits. And I do want to talk about the profits, because it's an important feature here, or aspect, when you're talking about competitors. This court has dealt with a lot of cases lately where we have licensing company and defendant. And in that situation... How did she deal with apportionment? Where did she deal with apportionment in the expert report with respect to the raid? Because I think one of your arguments is that you don't have to deal with apportionment for the base, because it can be taken care of with the raid. She did apportion, and we know that she apportioned... Where is that in the expert report? Again, I don't think that she used the words, I am apportioning. She did analyze the features of Georgia-Pacific that relate to apportionment. And that's, I believe, factor 13, which deals with the portion of the realizable profit that should be credited to the invention is distinguished from non-patent elements. Again, not necessarily a mathematical analysis, but it is one that this court has said addresses apportionment. And then also, I believe it's factor... Is it 10? I think we're missing some pages. Oh no, there it is. The nature of the patent invention... Well, she combines 9 and 10, I'm sorry. And the utility of an advantage is the patented property of an old motion. She goes through those elements right there. And also looked at the real-world evidence. The profits and what happened when there is an actual competitive situation between these two competitors. The evidence that when faced with a competitive situation involving a large customer, that ExSmart lowered its price by $639. That supports the idea of $250 or more. Now again, it doesn't say there's a calculation. That I started at $639 and I cut it in half for this reason and I cut a little more for that. That's not the sort of mathematical analysis that makes sense. But when you're looking at what number does make sense, as she settles on 5%, she would know and did take into account that by licensing, ExSmart's risking losing profits, losing sales where they lose $639 per moment. Again, it's not just that specific situation, but if there was an actual lost sale, she indicated that ExSmart would lose $1,800 per moment. Distinguishing the situation from that where you have a licensing company who only makes money if the defendant sells product. So again, there was not an up or down. I'm going to start at a number and I'm going to do the plus or minus. This court, in some sense, rejected that when it rejected the rule of thumb that we would start at a third and then go the up or down. There has to be a reasoned basis for the starting point, obviously. A reasoned basis for the starting point? We're under a 25% rule. I think that you're saying that you're not supposed to come up with a starting point and go up or down all because of this court's rejection of the 25% rule. I don't think that's the case. If one were to start, for example, with... I'm not saying starting with a starting point is the only way to do it, but I can't tell. I mean, you're asking us, I think, to accept 5%. Sounds really good because there's all this evidence to support it. But I think what we're supposed to analyze is methodology. The question is whether the methodology, whether I can even tell what that is when all she's done is list all the Georgia-Pacific factors and then say it's 5%. I submit that if we go back through the 40 years of Georgia-Pacific cases, that is exactly what experts have done for decades. And this court has approved those analyses. And we can cite the cases in our brief that talk about Georgia-Pacific analyses. Your Honors, I didn't get a chance to talk at all about priority and validity. Would you like me to talk about that? I'd like you to run over because I'm giving an extra two minutes to your closing counsel, so I'll give you another minute. The bottom line is this, Your Honor. They have the burden of proving invalidity by clear and convincing evidence. And here they face an extra high burden because the PTO not just re-examined the patent, re-examined it three times and addressed the same issue. That he now wants to argue gives them a fact question and a reason to go to the jury on validity. If you're going to ask a jury to simply disagree with the patent trial and appeal board, you better have pretty strong evidence on the other side. And that's what was missing here and that's what the judge said. He said, on this record, showing he's considered all the evidence, the evidence they've come forward with is simply insufficient to outweigh or to meet their burden of invalidity by clear and convincing evidence. Okay, wrap it up. Thank you. At the risk of redundancy, let me be clear. The examiners found under the district court's claim construction that these claims were invalid. Only when the PTAB changed that claim construction were they found valid. We were never given a chance. This is expressly stated in the PTAB appeal that there was no evidence. We were never given a chance to prove that even if the district court changed its claim construction, which it explicitly refused to do, the claims were obvious under that different claim construction. Under the meaningful effect claim construction, we still would have been able to put more than ample evidence, as laid out in our brief, that the claims were obvious. The claim was obvious. That was what we were deprived of the opportunity to do. And the PTAB appeal board itself said, the reason we are upholding the validity of this claim in light of our changed claim construction is because you, the examiners, didn't put forward evidence under the revised claim construction. We would do that in front of a jury. And we've laid out the evidence in our brief. A couple more points just to answer specific things.  Two observations. One is that was under the PTAB's construction, not the district court's construction. More importantly, that was a hypothetical. Totally disregarded the V part that we had the discussion about. That created the limitations. That created the curve straight curve shape. Your Honor, on the SCAG, you were absolutely right. The 3.25%, which obviously is lower than 5% in any event, was for all the claims of four patents. Here we're talking about one claim of one patent. And finally, on this chart, I won't belabor it, but we discussed it at length, 25 to 26. Counsel said we should look at the real world. I'll conclude with this. In the real world, they sold their baffles for between $26 and $49. That's at page 7022 of the appendix. That's the real world, not 5%, not $250. Thank you. Thank you, Counsel. The matter stands submitted. We are adjourned. All rise.